# UNITED STATES DISTRICT COURT
## SOUTHERN DISTRICT OF FLORIDA

### Miami Division

CASE NO: _____

MAURICIO USME, M.D., SAFETY OFFICER
LUKASZ ZUTEREK, CAROLINA VASQUEZ,
JAVIER PEREZ, JOHAN ORTIZ, LUZ GAVILAN
AND, MARVIN PAZ

      Plaintiffs

vs.

CMI LEISURE MANAGEMENT, INC.;
CRUISE MANAGEMENT INTERNATIONAL, INC.,
and VIKAND SOLUTIONS, LLC.

      Defendants.

_____/

## COMPLAINT

COME NOW the Plaintiffs MAURICIO USME, M.D., SAFETY OFFICER LUKASZ ZUTEREK, CAROLINA VASQUEZ, JAVIER PEREZ, JOHAN ORTIZ, LUZ GAVILAN AND MARVIN PAZ and sue the Defendants CMI LEISURE MANAGEMENT, INC., CRUISE MANAGEMENT INTERNATIONAL, INC. and VIKAND SOLUTIONS, LLC. and allege as follows:

## GENERAL ALLEGATIONS

### a. Subject Matter Jurisdiction

1.    This is an action for personal injuries and emotional distress under the Jones Act, 46 U.S.C. §3104 and as a result of the failure to provide prompt, adequate and proper maintenance and cure under the Jones Act and general maritime law seeking damages for each Plaintiff in excess of $75,000.00 (Seventy-five Thousand Dollars), exclusive of costs, attorneys' fees and interest.

2.    At all times material hereto, the Plaintiff MAURICIO USME, M.D. [hereinafter

1

"Dr. USME"], was and is a citizen of Columbia and employed as a seaman, working aboard the *Greg Mortimer* as a ship's physician.

3.     At all times material hereto, the Plaintiff LUKASZ ZUTEREK [hereinafter "Safety Officer ZUTEREK"], was and is a citizen of Poland and employed as a seaman, working aboard the *Greg Mortimer* as the ship's Safety Officer.

4.     At all times material hereto, the Plaintiff CAROLINA VASQUEZ. ["hereinafter VASQUEZ"], was and is a citizen of Chile and employed as a seaman, working aboard the *Greg Mortimer* as an assistant cook.

5.     At all times material hereto, the Plaintiff JAVIER PEREZ [hereinafter "PEREZ"], was and is a citizen of Honduras and employed as a seaman, working aboard the *Greg Mortimer* as a utility galley.

6.     At all times material hereto, the Plaintiff JOHAN ORTIZ [hereinafter ORTIZ"], was and is a citizen of Honduras and employed as a seaman, working aboard the *Greg Mortimer* as a hotel cleaner.

7.     At all times material hereto, the Plaintiff LUZ GAVILAN [hereinafter "GAVILAN"], was and is a citizen of Chile and employed as a seaman, working aboard the *Greg Mortimer* as a cabin stewardess.

8.     At all times material hereto, the Plaintiff MARVIN PAZ [hereinafter "Paz"], was and is a citizen of Honduras and employed as a seaman, working aboard the *Greg Mortimer* as a storeroom utility.

9.     At all times materials hereto, the Defendant CMI LEISURE MANAGEMENT, INC. [hereinafter "CMI-L"] is and was a U.S. corporation incorporated under the laws of the State of Florida and maintained its base of operations and principal place of business in Miami-Dade County and as such is a Florida citizen for the purposes of diversity of citizenship jurisdiction.

2

10.     At all times materials hereto, the Defendant CRUISE MANAGEMENT INTERNATIONAL, INC. [hereinafter "CMI Inc."] is and was a U.S. corporation incorporated under the laws of the State of Florida and maintained its base of operations and principal place of business in Miami-Dade County and as such is a Florida citizen for the purposes of diversity of citizenship jurisdiction.

11.     At all times materials hereto, the Defendant VIKAND SOLUTIONS, LLC [hereinafter "VIKAND"] is and was a U.S. corporation incorporated under the laws of the State of Florida and maintained its base of operations and principal place of business in Broward County and as such is a Florida citizen for the purposes of diversity of citizenship jurisdiction.

12.     This Court has jurisdiction over the person of the Defendants CMI-L, CMI Inc. and VIKAND as each Defendant is a Florida corporation, which maintains its principal place of business in this state.

13.     This court has diversity of citizenship jurisdiction over each of the Plaintiffs' claims against the Defendants CMI-L, CMI Inc. and VIKAND by virtue of 28 U.S.C. §1332(a)(2) in that at all times material each of the Plaintiffs were citizens of a foreign country and each of the Defendants were citizens of the state of Florida.

14.     Alternatively, this court has admiralty jurisdiction over the claims of each Plaintiff against each Defendant by virtue of 28 U.S.C. §1333 in that the underlying incident occurred aboard a vessel located on navigable waters and is connected with maritime activity, to wit: service aboard such vessel as seamen.

### b. Status of the Parties

15.     At all times material hereto, each of the Plaintiffs were seamen under the Jones Act and U.S. general maritime law, since they were each employed by the Defendants CMI-L and/or CMI, Inc. while serving aboard the *Greg Mortimer*.

3

16.     In the alternative, the Defendants CMI-L was the Jones Act employer of the Plaintiffs VASQUEZ, PEREZ, ORTIZ, GAVILAN AND PAZ by virtue of their status as a borrowed servant in that said Defendant controlled all aspects of each Plaintiff's work, including but not limited to: interviewing them, performing background checks and pre-employment physicals and making the determination to hire them; training each Plaintiff for his or her work tasks; assigning them to their positions aboard the vessel; designing their jobs and determining their specific daily work duties; supervising, directing and monitoring their performance of their work tasks on a daily basis; establishing rules and regulations for the performance of their work duties; evaluating their performance of their work tasks for the purposes of maintaining their employment aboard the vessel; setting their hours of work; maintaining the right to transfer them to another vessel if it needed to do so in order to meet its business obligations; maintaining the right to fire and/or discipline them; determining whether the vessel they were assigned to was safe to sail; managing their medical needs and controlling their ability to obtain medical attention both aboard the vessel or shoreside when necessary to treat injuries or illness occurring during their service to the vessel; and handling all claims arising out of their employment.

17.     In the alternative, the Defendant CMI, Inc. was the Jones Act employer of the Plaintiffs DR. USME and SAFETY OFFICER ZUTEREK by virtue of their status as a borrowed servant in that said Defendant controlled all aspects of each Plaintiff's work, including but not limited to: interviewing them, performing background checks and pre-employment physicals and making the determination to hire them; training each Plaintiff for his or her work tasks; assigning them to their positions aboard the vessel; designing their jobs and determining their specific daily work duties; supervising, directing and monitoring their performance of their work tasks on a daily basis; establishing rules and regulations for the performance of their work duties; evaluating their performance of their work tasks for the purposes of maintaining their employment aboard the

4

vessel; setting their hours of work; maintaining the right to transfer them to another vessel if it needed to do so in order to meet its business obligations; maintaining the right to fire and/or discipline them; determining whether the vessel they were assigned to was safe to sail; managing their medical needs and controlling their ability to obtain medical attention both aboard the vessel or shoreside when necessary to treat injuries or illness occurring during their service to the vessel; and handling all claims arising out of their employment.

18.     As Jones Act seamen, each Plaintiff is entitled to the federal statutory remedies set forth in the Jones Act, 46 U.S.C. §3104 and the Federal Employers Liability Act, 45 U.S.C. §51 et seq incorporated therein by reference as well as the remedies guaranteed by the United States Supreme Court set forth as part of the general maritime law for seamen, including but not limited to maintenance and cure.

19.     At all times material hereto, the Defendant VIKAND entered into a contract or agreement with the Defendants CMI, Inc. and/or CMI Ltd to provide medical management and consulting services for the subject vessel and the medical needs of the seamen aboard it, including the Plaintiffs herein. The Plaintiffs are unable to attach a copy of said contract to their complaint, since they do not presently have a copy in their possession.

20.     At all times material hereto, the Greg Mortimer was chartered to Aurora Travel Pty Ltd., trading as Aurora Expeditions [hereinafter "AURORA"], an Australian company.

### c. The Underlying Incident

21.     Prior to signing on to the vessel, each of the Plaintiffs underwent and passed a thorough pre-employment medical evaluation in which they were each found to be fit for duty and free from disease or illness.

22.     At all times materials hereto, each of the Defendants knew or should have known and was on notice that it was necessary to take the appropriate precautions to protect the seamen

working aboard the *Greg Mortimer*, including the Plaintiffs, from contracting COVID-19, also known as coronavirus [hereinafter referred to as "COVID-19"] in order to provide them with a safe place to work and to maintain their health, by virtue of, but not limited to the following:

a. On January 24, 2020, the U.S. Coast Guard issued its first Marine Safety Information Bulletin (MSIB) entitled Novel Coronavirus Precautions, directed to vessel surveillance procedures and precautions against the COVID-19 for the safety of passengers and crew, warning "Global surveillance is in the early stages and confirmation of more cases in China and beyond its borders is expected. There have been cases discovered across the globe, including 2 cases in the United States; and/or

b. On January 30, 2020 the World Health Organization ("WHO") formally declared COVID–19 a public health emergency of international concern, warning that "international exportation of cases may appear in any country," stressing the importance of "put[ing] in place strong measures to detect disease early, isolate and treat cases, trace contacts, and promote social distancing measures commensurate with the risk;" and/or

c. On January 31, 2020 a Presidential Proclamation was issued in the United States suspending and limiting entry for all aliens who had been present in China during the 14 days preceding entry to the US (effective Feb. 2) as a result of the outbreak of COVID-19; and/or

d. Also on January 31, 2020 the U.S. Dept. of Transportation's ("DOT") Maritime Administration issued an Industry (MSCI) Advisory warning of "An outbreak of respiratory illness caused by a novel coronavirus (2019-nCoV) will affect mariners and maritime commerce." The warning reiterated the contents of the above-described WHO declaration of January 30, 2020 and the U.S. Coast Guard Bulletin of January 24, 2020, and/or

e. On February 3, 2020 the Japanese Ministry of Health issued an order of quarantine of the *Diamond Princess* after 10 people tested positive for COVID-19, and/or

f. On February 3, 2020 Healthy Gateways & The Health Programme of the European Union issued "Advice for ship operators for preparedness and response to outbreak of 2019-nCov acute respiratory disease" with specific recommendations for cruise ship travel detecting Covid symptoms, procedures for minimizing potential outbreaks, the maintenance onboard of specific supplies and equipment and the management of suspected cases; and/or

g. Between February 5, 2020 and February 18, 2020, newspapers worldwide were reporting on the outbreak of COVID-19 aboard the *Diamond Princess* while the ship was quarantined in Yokohama Harbor Japan, during which time the

6

outbreak began with 10 confirmed cases (1 crew and 9 passengers) and then rapidly multiplied to 700 hundred confirmed cases among both passengers and crew despite Princess' institution of quarantine procedures, and/or

h. On February 8, 2020: the U.S. DOT's Maritime Administration issued a MSCI Advisory (update) entitled Global Novel Coronavirus Outbreak again warning vessel owners and operators of the need to take precautions because of the global outbreak of Covid-19; and/or

i. On February 18, 2020 the CDC published its Interim Guidance for Ships on Managing Suspected COVID-19 Disease 2019, which reiterated the need for "[e]arly detection, prevention, and control of Coronavirus Disease 2019 (COVID-19) on ships is important to protect the health of travelers on ship[s] and to avoid transmission of the virus by disembarking passengers and crew members. . . ." The guidelines further provided guidance for ships "to help prevent, detect, and medically manage suspected COVID-19 infections;" and/or

j. On February 18, 2020 the CDC issued a statement that the rate of new reports of positive symptoms on board the Diamond Princess "highlights the <u>high burden of infection on the ship</u> and <u>the potential for ongoing risk.</u>" The CDC report further warned that "While the quarantine potentially conferred a significant public health benefit in slowing transmission, <u>CDC's assessment is that it may not have been sufficient to prevent transmission among individuals on the ship.</u>" and/or

k. On February 26, 2020, news media throughout the United States reported that multiple Caribbean Islands, including Jamacia and Grand Cayman Island turned away cruise ships out of concern for safe guarding their populations from Contracting COVID-19; and/or

l. On March 7, 2020 lobbyists for the Cruise Line International Association ("CLIA"), the main lobbying organization for the North American cruise industry of which the charterer Aurora is a member, meet with Florida Governor Ron DeSantis and Vice President Mike Pence to discuss how to handle COVID-19 infections of crew and passengers aboard cruise ships; and/or

m. On March 8, 2020, the U.S. State Department issued an alert warning that "travelers, particularly with underlying health conditions, <u>should not travel by cruise ship</u>. The CDC notes <u>increased risk of infection of COVID-19 in a cruise ship environment</u>. In order to curb the spread of COVID-19 <u>many countries</u> have implemented strict screening procedures that have <u>denied port entry</u> rights to ships and prevented passengers from disembarking." and/or

n. On March 9, 2020 the Coast Guard issued a Marine Safety Information Bulletin entitled Novel COVID-19 – Update, warning that "[a]n outbreak of respiratory illness caused by novel COVID-19 (COVID-19) <u>may affect mariners and maritime commerce</u>" and the "[i]llness of a person onboard a vessel that may

7

adversely affect the safety of a vessel or port facility is a <u>hazardous condition</u>. . . ." The Coast Guard further notified vessels that "[t]he CDC has updated their Interim Guidance for Ships on Managing Suspected COVID-19 Disease 2019;" and/or

o. On March 9, 2020 the CDC issued a "no sail" order for the *Caribbean Princess* in the midst of a cruise, requiring the vessel to return to U.S. waters for the testing of crew members suspected of having COVID-19; and/or

p. On March 11, 2020 the WHO announced that "[i]n the past two weeks, the number of cases of COVID-19 <u>outside China has increased 13-fold</u>, and the number of affected countries has tripled." Expressing "deep concern[] both by the <u>alarming levels of spread and severity</u>, and by the <u>alarming levels if inaction</u>," the WHO <u>declared COVID–19 "a pandemic</u>," as <u>118,000 cases in 114 countries</u> were reported at the time and reiterated the need to "detect, test, isolate, trace and mobilize . . . in response" to control and prevent additional outbreaks; and/or

q. <u>On March 12, 2020 Princess Cruises, Viking Cruises and Disney Cruise Lines all announced that they were stopping cruising</u> due to the spread of the COVID-19 on cruise vessels; and/or

r. On March 13, 2020, CLIA, of which Aurora is a member, announced that <u>all of its member cruise lines</u> were voluntarily suspending operations related to U.S. ports due to the spread of the COVID-19 on cruise ships, and/or

s. On <u>March 14, 2020, the CDC issued a No Sail Order</u> applicable to cruise ships subject to the jurisdiction of the United States with a capacity of 250 or more passengers and crew operating in international waters, because they are "<u>particularly conducive to SARS-CoV-2 spread</u>, resulting in high transmission rates," further pointing out that the <u>risk factors of infection to both passengers and crew was due to the nature and function of cruise ships</u>, which nature and function is applicable to all cruise ships regardless of whether they are directly controlled by the Order or not, including:

- "Like other close-contact environments, cruise ships facilitate transmission of COVID-19."

- "There are several features of cruise ships that increase the risk of COVID-19 transmission."

- "A hallmark of cruise travel is the number and variety of person-to-person contacts an individual passenger may have daily."

- "The dynamics of passenger-to-passenger, passenger-to-crew, crew-to-passenger, and crew-to-crew intermingling in a semi-closed setting are particularly conducive to SARS-CoV-2 spread, resulting in high transmission rates."

8

- "Cruises include frequent events that bring passengers and crew close together, including group and buffet dining, entertainment events, and excursions. Cruise ship cabins are small, increasing the risk of transmission between cabin mates."

- "Close quartering is a particular concern for crew, who typically eat and sleep in small, crowded spaces."

- "Infection among crew members may lead to transmission on sequential cruises on the same vessel because crew members may continue working and living onboard the ship from one cruise to the next." and/or

t. In other manners expected to be revealed in discovery.

23.     The Greg Mortimer is a small cruise ship specializing in what its charterers and operators advertise as "Expedition Cruising," which is described as travel "to the remote coastal regions of our globe." As a result of its size and itinerary, the medical facilities onboard and ashore available to treat both passengers and crew is significantly less than that which is available for larger ships traveling more typical routes in the United States, Caribbean, Asia and Europe.

24.  Despite the above-described notice of the increasingly rampant spread of COVID-19 among passengers and crew aboard cruise ships worldwide and the repeated warnings of health officials across the world that cruise ships by their nature and activities were particularly conducive to the spread of COVID-19 to infect both passengers and crew, the *Greg Mortimer* continued to sail into areas of the Antarctic where there were limited medical facilities during the months of February and March 2020, even after the CDC issued its first No Sail Order and CLIA announced that its member cruise lines, which included the charterer and/or operator of the *Greg Mortimer*, were voluntarily suspending operations.

25.     On or about March 4, 2020, the *Greg Mortimer* stopped at Frei Station, Antarctica to disembark some passengers and to embark others for an expedition cruise in remote areas of the world.

9

26.     On or about March 15, 2020, the *Greg Mortimer* called at Ushuaia, Argentina, at which time it discharged passengers from one cruise and began preparations to embark on another cruise with new passengers.

27.     The *Greg Mortimer* was met in Ushuaia by representatives and/or employees from CMI-L, CMI Inc. and VIKAND for the purpose of determining whether to start on the next cruise. At that time, the Plaintiff Dr. USME, the ship's physician, strongly advised the Defendants against starting another cruise due to the risk posed by COVID-19. Despite this advice and that CLIA had <u>previously</u> announced that its member cruise lines (which included Aurora) had discontinued sailing IN North America, the World Health Organization had earlier declared COVID-19 a world pandemic and the CDC had already entered its first No Sail Order, the Defendants made the determination to begin the next cruise as scheduled.

28.     Representatives of the Defendants attempted to screen the passengers and crew prior to the start of the voyage and stated that no one was suffering from COVID-19.  As a result the voyage commenced as scheduled on March 15, 2020, despite the fact that the Defendants knew or should have known of the severe risk which COVID-19 posed to the crew and passengers of said vessel.

29.     On or about March 22, 2020, during the course of the voyage, the ship's physician, the Plaintiff Dr. USME, discovered that a passenger exhibited the signs and symptoms of COVID-19 and promptly advised the ship's Captain Joachim Saterskog, who in turn informed the Defendants CMI, Inc., CMI-L and VIKAND. At that time Dr. USME further advised the Captain, "I will put the patient and her husband under preventive isolation.  We need to activate immediately the protocol on board for a Possible Coronavirus case."

30.     After determining that Argentina would not allow the ship to return, the decision was made to instead go to nearby Uruguay. By this time, however, additional passengers and crew

10

members were showing symptoms of COVID-19.

31.     The health authorities of Uruguay required the completion of a form entitled "Maritime Declaration of Health," which asked the following questions that the Plaintiff Dr. USME answered as the ship's doctor:

> Is there on board or has there been on board during the voyage, any disease which you suspect to be of an infectious nature? Give particulars on schedule.
>
> > [Answer]  YES  We have 7 patients under protective isolation 3 has fever 2 had fever and 2 asymptomatic (preventive isolation)
>
> Is there any sick person on board now? Give particulars in the schedule.
>
> > [Answer]  YES  March 22 2020 1 guest with fever cabin 615 also March 24# 3 crew member with fever  the guest is without fever since 38 hours ago.
>
> Are you aware of any other condition which may lead to infection or spread disease?  Give details.
>
> > [Answer]  YES  We have 7 patients under quarantine for 14 days.
>
> Has Sanitary measure (e.g. quarantine, isolation, disinfections or decontamination) been applied onboard?
>
> > [Answer]  YES  Quarantine 14 days for all the patients  sanitation with chlorine for all the ship self isolation or all the crew members and guest on board self isolation in cabins. . . . .
>
> Have you been in quarantine?  [Answer]  yes  If so, for what?  [Answer]  fever  At what station?          For how many days?  [Answer]  Self isolation for everybody on board and quarantine for the patient 14 days

32.     Prior to the submission of the Maritime Declaration of Health form to the Uruguay health officials, Dr. USME was requested on multiple occasions by both the Defendants  as well as the Captain to change the above answers to the questions on the form "yes" to "no," which he continually refused to do, responding in an email that he would not make the requested change: "For ethics, for morality, for responsibility with ourselves and with the health of those who are not affected, the health declaration must reflect the reality that we currently have."

11

33.     After receiving the accurate health form as prepared by Dr. USME and sending a medical team to examine the passengers and crew, the government of Uruguay allowed the *Greg Mortimer* to anchor in its waters on March 27, 2020. Although all of the passengers disembarked and were flown home, the Defendants CMI, Inc. and CMI-L did not disembark their employees, including the Plaintiffs, but instead held them in confinement in small crew cabins, approximately 70 square feet.  Finally, on May 12, 2020 the crew were taken ashore in Uruguay and required to remain in their hotel rooms in quarantine until they were eventually repatriated at different times approximately one month later.

34.     Throughout much of April, the Defendants CMI, Inc. and/or CMI-L advised the Plaintiffs that they would be kept on board the ship anchored off of the Port of Montevideo in Uruguay for an undefined time and that the ship would thereafter sail from Uruguay to the Canary Islands, located off of the coast of Morocco, where they would be disembarked and then flown home to Chile, Honduras, Nicaragua, Columbia and Poland.

35.     The Plaintiffs, who include the Ship's Physician and Safety Officer, objected to this proposal as being unreasonably hazardous for the crew as it would have required the crew to remain on the ship in close contact with other crew members suffering from the highly contagious COVID-19 for an untold number of weeks until the ship was ready to sail to the Canary Islands and to then sail across the Atlantic Ocean without access to shoreside medical care on a journey of approximately another three weeks under highly hazardous conditions to an island off of the coast of Africa, only to then be transported back to Latin and South America.

36.     Despite the objections of the crew, Ship's Physician and Safety Officer, the Defendants persisted with the above ill-conceived plan until the intervention of the government of Honduras, which formally advised the Defendants CMI-L and CMI, Inc. on April 30, 2020 of its objection to the Defendant's plan, stating in writing,

12

[W]e reiterate our total disagreement, with what was planned, according to the news, "to take them to the Canary Island, which would take 27 days on the high seas," generating a greater risk of becoming infected on board, that is why it is requested that all measures to be taken are to keep the good health and life of crew members.

Accordingly, the Honduran government

made an urgent request to Cruise Management International (CMI), regarding the application of the[ir] insurance to use a charter flight or ambulances for the urgent return (repatriation) of the 13 Honduran crew members aboard the Greg Mortimer cruise.

See Correspondence from Kenia Godoy, Charge of Consular Affairs, Ministry of Foreign Affairs and International Cooperation of Honduras dated April 26, 2020 to Anne Tompkins, Director of Human Resources, CMI-L (inaccurately identified in the letter as CMI, Inc.), Miami, Florida attached as Exhibit 1 hereto.

37.    Prior to the intervention of the Honduran government, once the Defendants announced their plan for repatriation, the Plaintiffs suffered tremendous anxiety, terror and emotional distress as they were in constant fear for their lives, since they each believed with good objective reason that the Defendants' plan to make them stay onboard the *Greg Mortimer* for untold weeks, followed by having to sail across the Atlantic Ocean to the Canary Islands in close contact with crew members who were suffering from COVID-19 without access to outside medical care, only to then be transported back to Latin and South America, would expose them to the illness, serious injury and possible death in light of the documented highly contagious nature or coronavirus and the rapidly increasing world death toll.

38.    As a result of the failure of the Defendants to provide the crew with a safe place to work, at least 33 of the vessel's 85 crew members tested positive for COVID-19, including one (1) who died.

39.    As a legal result of the failure of the Defendants to provide the Plaintiffs with a safe

13

place to work and/or to negligently expose them to the risk of contracting COVID-19 and/or failing to timely and properly repatriate them in a reasonably safe manner as previously described, the Plaintiffs suffered the following injuries and damages while aboard the *Greg Mortimer*, which are continuing in nature:

a.  Dr. Usme:

(1) Dr. Usme first exhibited the symptoms of COVID-19, including fever, shortness of breath, chest pain, malaise, body ache, dry cough, shivering and chills while onboard the *Greg Mortimer* and was subsequently diagnosed with COVID-19.

(2)  As a result of the serious life-threatening nature of his resulting pneumonia and respiratory distress, he was taken from the ship by emergency evacuation and hospitalized in Uruguay for six (6) days, spending time in both the ICU and advanced care units.

(3)  Following his discharge from the hospital, he was returned to the ship where he was again required to remain in quarantine, before eventually being taken ashore in Uruguay and required to remain in quarantined again for an extended time with the rest of the crew.

(4)  Subsequently, he was required to be hospitalized again in Uruguay while awaiting repatriation and then upon returning home to Columbia he was hospitalized yet again and also required to obtain extensive outpatient medical care.

(5)  During the time he was captive aboard the vessel, Dr. Usme remained in constant fear, desperation and anxiety for his life, as well as the health and future of his family and his ability to continue working as a doctor. This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above. This fear and anxiety was further exacerbated by the Defendants above described pressure and attempts to have Dr. Usme change the health forms he was required to prepare for the Uruguay authorities and to misrepresent the status of the health of passengers and crew aboard the vessel.

14

(6)  Dr. Usme was unable to work for a considerable time and continues to suffer from symptoms of COVID-19 and post-traumatic stress disorder.  As a result he incurred medical expenses and lost earnings for which he has not been reimbursed and will continue to incur such losses in the future.

(7)  As a legal cause of the negligence described in this complaint, Dr. Usme sustained serious and permanent injuries to his body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

b. Luz Gavilan:

(1)  Following the initial diagnosis of COVID-19 among passengers and prior to her diagnosis, Luz Gavilan was required by the Defendants to keep on working with other crew members, which continued to increase her anxiety, desperation and stress over the fear of contracting COVID-19, which progressively became worse as more crew members began to become diagnosed with coronavirus.

(2)  While on board, Luz Gavilan first exhibited symptoms of COVID-19, including fever, severe headaches and body pain, problems breathing and difficulty sleeping for which she was placed on a variety of medications and was then diagnosed with COVID-19.  She also developed an allergic reaction which required medication.

(3)  During this time while trapped aboard the vessel, Ms. Gavilan remained in constant fear, terror, desperation and anxiety of death and serious injury, which was exacerbated by the death of one of her fellow crew members from complications of the disease while she was captive aboard the vessel in quarantine, the lack of information from the Defendants and the expressions

15

of other crewmembers who were contemplating suicide. This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

(4)   After finally being discharged from the ship in Uruguay, Ms. Gavilan was again required to remain in quarantine for an extended time, during which time she received medical care and medicine for both her physical and psychological injuries.

(5)   Upon returning home to Chile Ms. Gavilan continued to receive medical care and remains in continual anxiety suffering from symptoms of post-traumatic stress disorder.

(6)   As a result, Ms. Gavilan has been unable to work since her return home and has incurred medical expenses and lost earnings for which he has not been reimbursed and will continue to incur such losses in the future.

(7)   As a legal cause of the negligence described in this complaint, Luz Gavilan sustained serious and permanent injuries to her body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

c.  Marvin Paz

(1) Following the initial diagnosis of COVID-19 among passengers and prior to his diagnosis, Marvin Paz was required to keep on working with other crew members, which continued to increase his anxiety and stress over the fear of contracting COVID-19, which progressively became worse as more crew members began to become diagnosed with coronavirus.

(2)   While on board, Marvin Paz first exhibited symptoms of COVID-19, including fever, headaches, body pain, sore throat, leg swelling and difficulty sleeping and was then diagnosed

with coronavirus.

(3)  During this time while trapped aboard the vessel, Mr. Paz remained in constant fear, terror and anxiety of death and serious injury, which was exacerbated by the death of one of his fellow crew members from complications of the disease while he was captive aboard the vessel in quarantine, the lack of information from the Defendants, fear over his future ability to work and the expressions of other crewmembers who were contemplating suicide. This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

(4)  After finally being discharged from the ship in Uruguay, Mr. Paz was again required to remain in quarantine for an extended time, during which time he received medical care and medicine for both his injuries and medical condition.

(5)  Upon returning home to Chile Mr. Paz continued to receive medical care and remains in continual anxiety suffering from symptoms of post-traumatic stress disorder.

(6)  As a result, Mr. Paz has been unable to work since her return home and has incurred medical expenses and lost earnings for which he has not been reimbursed and will continue to incur such losses in the future.

(7)  As a legal cause of the negligence described in this complaint, Marvin Paz sustained serious and permanent injuries to her body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

d. Safety Officer Lukasz Zuterek

(1)  Although he did not test positive for COVID-19, Safety Officer Lukasz Zuterek

17

remained in the zone of danger for contracting it while working aboard the vessel, until he was improperly fired and removed from the vessel for protesting against the Defendants extremely hazardous and ill-conceived plan to force the crew members to remain on the vessel and sail from Uruguay to the Canary Islands, only to be flown back to their home countries in Latin and South America.

(2)  Immediately prior to his protests over this plan, Safety Officer Zuterek received an excellent evaluation, which recommended that he be rehired.

(3)  During the time he remained trapped aboard the vessel, Safety Officer Zuterek remained in constant fear, desperation and anxiety of death and serious injury, which was exacerbated by the death of one of his fellow crew members from complications of the disease while he was captive aboard the vessel prior to his repatriation.

(4)  This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

(5)  This stress and anxiety was also exacerbated by his improper false imprisonment and termination as described in Counts V and VI for trying to protect the safety of the crew and by the damage to his reputation and career as described in Count VII and as a result he continues to suffer from symptoms of post-traumatic stress disorder in addition to damage to his reputation and career, resulting in a significant loss of past income and future earning capacity.

e.  Carolina Vasquez

(1) Following the initial diagnosis of COVID-19 among passengers and prior to her diagnosis, Carolina Vasquez was required to keep on working with other crew members, which continued to increase her anxiety and stress over the fear of contracting COVID-19, which progressively became worse as more crew members began to become diagnosed with coronavirus.

(2)  While on board, Carolina Vasquez first exhibited symptoms of COVID-19, including

fever, headaches, body pain, sore throat, aggravation of her asthma and difficulty sleeping and was then diagnosed with coronavirus when she was taken off of the ship and placed in quarantine in Uruguay.

(3)   During the time while she was trapped aboard the vessel, Ms. Vasquez remained in constant fear, terror, desperation and anxiety of death and serious injury, which was exacerbated by the death of one of her fellow crew members from complications of the disease while she was captive aboard the vessel in quarantine, confined in a small windowless cabin for weeks, the lack of information from the Defendants, fear over her future ability to work and the safety of her family and the expressions of other crewmembers who were contemplating suicide. This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

(4)   After leaving the ship Ms. Vasquez was required to remain in quarantine for an extended time in Uruguay where she received medical and psychiatric care for her injuries and medical conditions.

(5)   Upon returning home to Chile Ms. Vasquez continues to suffer from complications of COVID-19 and symptoms of post-traumatic stress disorder for which she still undergoes treatment and takes medication.

(6)   As a result, Carolina Vasquez has been unable to work since her return home and has incurred medical expenses and lost earnings for which she has not been reimbursed and will continue to incur such losses in the future.

(7)   As a legal cause of the negligence described in this complaint,  Carolina Vasquez sustained serious and permanent injuries to her body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished

earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

   f.  Javier Perez

   (1) Following the initial diagnosis of COVID-19 among passengers and prior to his diagnosis, Javier Perez was required to keep on working with other crew members, which continued to increase his anxiety and stress over the fear of contracting COVID-19, which progressively became worse as more crew members began to become diagnosed with coronavirus.

   (2) While on board, Mr. Perez first exhibited symptoms of COVID-19 and was then diagnosed with coronavirus after which he was eventually taken off of the ship and placed in quarantine in Uruguay.

   (3) During the time while he was trapped aboard the vessel, Mr. Perez remained in constant fear, terror, desperation and anxiety of death and serious injury, which was exacerbated by the death of one of his fellow crew members from complications of the disease while he was captive aboard the vessel in quarantine, the lack of information from the Defendants, fear over his future ability to work and the expressions of other crewmembers who were contemplating suicide. This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

   (4)  After leaving the ship Mr. Perez was required to remain in quarantine in Uruguay for an extended time, where he developed additional complications including chest pain, requiring hospitalization and medical care.

   (5)  Upon returning home Mr. Perez continues to suffer from complications of COVID-19 and symptoms of post-traumatic stress disorder for which he still undergoes treatment.

   (6)  As a result, Javier Perez has been unable to work since his return home and has incurred medical expenses and lost earnings for which he has not been reimbursed and will continue to

incur such losses in the future.

(7)  As a legal cause of the negligence described in this complaint,  Javier Perez sustained serious and permanent injuries to his body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

g.   Johan Ortiz

(1) Following the initial diagnosis of COVID-19 among passengers and prior to his diagnosis, Johan Ortiz was required to keep on working with other crew members, which continued to increase his anxiety and stress over the fear of contracting COVID-19, which progressively became worse as more crew members began to become diagnosed with coronavirus.

(2) While on board, Johan Ortiz first exhibited symptoms of COVID-19, including fever, headaches, fatigue, and difficulty sleeping for which he was given medication and was then diagnosed and placed in quarantine.

(3) During this time while he was trapped aboard the vessel, Mr. Ortiz remained in constant fear, terror, desperation and anxiety of death and serious injury, which was exacerbated by the death of one of his fellow crew members from complications of the disease while he was captive aboard the vessel in quarantine, the lack of information from the Defendants, fear over his future ability to work and the expressions of other crewmembers who were contemplating suicide.  This fear and anxiety was exacerbated by the Defendants ill-advised plan to repatriate the crew by making them sail to Africa as described above.

(4)  After he left the ship, Mr. Ortiz was required to remain in quarantine in Uruguay for an extended period of time before eventually being repatriated home.

21

(5)  Upon returning home Mr. Ortiz continues to suffer from complications of COVID-19 and the symptoms of post-traumatic stress disorder for which he takes medication.

(6)  As a result, Johan Ortiz has been unable to work since his return home and has incurred medical expenses and lost earnings for which he has not been reimbursed and will continue to incur such losses in the future.

(7)  As a legal cause of the negligence described in this complaint, Johan Ortiz sustained serious and permanent injuries to his body and extremities; resulting pain, suffering and mental anguish; disability; aggravation of preexisting conditions; inconvenience; loss of the capacity for the enjoyment of life, loss of past earnings, loss of future earnings and diminished earning capacity in the future, and has incurred medical expenses in the past and will incur medical expenses in the future.  All of said damages are permanent and continuing in nature.

## COUNT I

### JONES ACT CLAIM AGAINST CMI, INC.
### BY DR. USME AND SAFETY OFFICER ZUTEREK

40.     The Plaintiffs repeat and adopt paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15) and seventeen (17) through thirty-nine (39) above and further aver:

41.     The Jones Act, 46 U.S.C. §30104 f/k/a 46 App. U.S.C.A. §688 provides:

> A seaman injured in the course of employment or, if the seaman dies from the injury, the personal representative of the seaman may elect to bring a civil action at law, with the right of trial by jury, against the employer. Laws of the United States regulating recovery for personal injury to, or death of, a railway employee apply to an action under this section. (emphasis added)

42.     The Federal Employers Liability Act, 45 U.S.C. §51, which is incorporated by reference into the Jones Act protections provided to seamen, provides in pertinent part:

> Every common carrier by railroad while engaging in commerce . . . shall be liable in damages to any person suffering injury while he is employed by such carrier in

22

such commerce . . . for such injury or death resulting in whole or in part from the negligence of any of the officers, agents, or employees of such carrier, or by reason of any defect or insufficiency, due to its negligence, in its cars, engines, appliances, machinery, track, roadbed, works, boats, wharves, or other equipment.

43.     The Federal Employers Liability Act, 45 U.S.C. §55, which is incorporated by reference into the Jones Act protections provided to seamen, provides in pertinent part:

> <u>Any contract, rule, regulation, or device whatsoever, the purpose or intent of which shall be to enable any common carrier to exempt itself from any liability created by this chapter, shall to that extent be void</u>: *Provided,* That in any action brought against any such common carrier under or by virtue of any of the provisions of this chapter, such common carrier may set off therein any sum it has contributed or paid to any insurance, relief benefit, or indemnity that may have been paid to the injured employee or the person entitled thereto on account of the injury or death for which said action was brought. (emphasis added)

44.     At all times material hereto, the Plaintiffs Usme and Zuterek were employed by the Defendant CMI, Inc. while serving aboard the *Greg Mortimer* as seamen under the Jones Act and U.S. general maritime law and accordingly, the Defendant CMI, Inc. was their Jones Act employer.

45.     In the alternative, as set forth in detail in paragraph eighteen (18) above, the Defendant CMI, Inc. was the Jones Act employer of the Plaintiffs Usme and Zuterek by virtue of their status as borrowed servants in that said Defendant controlled all aspects of their work.

46.     As a result of the Plaintiffs' status as seamen and the Defendant's relationship as their employer, the Defendant CMI, Inc. owed each of the Plaintiffs the legal duty to use reasonable care to provide them with a safe place to work as well as the legal duty to provide them with prompt, adequate and proper cure for any illness, sickness, disease, condition and/or injury which was contracted, aggravated and or manifested itself while they were in the service to their vessel.

47.     The Defendant CMI, Inc. negligently complied with its legal duties under the Jones Act to each of the Plaintiffs, including but not limited to in the following manners:

   a. By failing to provide the Plaintiffs with a safe place to work and instead exposing them to COVID-19, which each of the Plaintiffs contracted as a result of their employment with the Defendant, and/or

23

b.  By refusing to cancel the March 15, 2020 voyage and instead proceeding forward with it, thereby exposing each of the Plaintiffs to an unreasonable risk of contracting COVID-19, which they in fact did, and/or

c.  By performing inadequate, incomplete, careless or insufficient medical evaluations of the passengers and crew aboard the *Greg Mortimer* to identify anyone carrying the disease prior to the commencement of the March 15, 2020 voyage, and/or

d.  By failing to timely enact and/or properly implement appropriate, sufficient and adequate procedures to safeguard the passengers and crew from contracting and/or spreading COVID-19, including but not limited to those recommended by the CDC and other governmental health authorities, and/or

e.  By failing to provide the crew with proper, sufficient and adequate personal protection equipment, including but not limited to appropriate and sufficient masks, gloves, coveralls, safety glasses, face masks and protective clothing, and/or

f.  By failing to provide proper, sufficient and adequate medical testing equipment to perform proper and timely testing on passengers and crew to determine if they had contracted COVID-19, and/or

g.  By failing to properly, sufficiently and adequately sanitize and/or disinfect the vessel's common areas, passenger cabins and/or crewmembers' cabins aboard the vessel to prevent the spread of COVID-19, and/or

h. By failing to adopt and/or implement safe and sanitary food practices aboard the vessel designed to prevent the spread of COVID-19, and/or

i.  By failing to adopt and/or implement proper, adequate and appropriate policies in place to manage and/or contain the outbreak and spread of COVID-19, and/or

j.  By failing to provide sanitary vessels upon which the Plaintiffs were assigned to work so as to prevent outbreaks of COVID-19, as a result of inadequate and/or ineffective cleaning and sanitary procedures and/or a lack of equipment and supplies, and/or

k. By failing to equip the vessel and/or to provide crewmembers with a sufficient amount of cleaning and/or disinfectant equipment and/or personal protective equipment, and/or

l. By failing to consult with the appropriate shoreside medical specialists once the Captain first became aware that one of the passengers had the signs and symptoms of COVID-19 and/or by refusing or failing to follow the recommendations of shoreside medical specialists regarding the proper response thereto and/or

m.  In other manners expected to be revealed in discovery.

24

48.     That at all times material, the Defendant CMI, Inc. knew or should have known of the above described negligent acts or omissions and was on notice of the hazards that they created for its crewmembers to contract COVID-19 and did not correct or remedy them and as a legal result thereof each of the Plaintiffs contracted or were in the zone of danger for contracting COVID-19 while in the course of their employment with the Defendant.

49.     The Defendant is vicariously liable and/or otherwise responsible for the acts and omissions of the crew and officers aboard the vessel and its other employees working aboard the subject vessel and/or on land.

50.     Under the Jones Act, the Defendant is also vicariously liable for the negligence of all of the shoreside doctors, nurses, hospitals and health care providers it selected to treat the Plaintiffs or to provide medical advice regarding such diagnosis and treatment, including but not limited to the Defendant VIKAND.

51.      The above described negligent acts and/or omissions caused and/or contributed to the Plaintiffs contracting and/or being placed in the zone of danger for contracting COVID-19 and other resulting medical complications, conditions and personal injuries.

52.     As a legal result thereof, the Plaintiffs each suffered extreme physical pain and suffering, mental anguish, reduced lung function and/or capacity and other physical injuries and suffered a loss of enjoyment of life, physical and/or functional disability, physical and/or functional impairment, aggravations of previously existing conditions, medical expenses, lost wages and impairment of their working capacity. Said injuries are permanent in nature and accordingly, the Plaintiffs' losses and damages are continuing in nature.

53.     In addition, the Plaintiff USME, who manifested the symptoms of COVID-19 after coming into physical contact with and sustaining a physical impact from the virus while on board the subject vessel or alternatively was in the zone of danger of contacting COVID-19, suffered

severe emotional distress as a legal result of the Defendant's above described negligence and continues to suffer from the effects of post-traumatic stress disorder due to:

a. His objective, genuine and serious fear of contracting COVID-19 and suffering from the severe consequences, including death and serious injury and disability, caused by said disease, as a result of the Defendant's refusal to cancel the voyage of March 15, 2020 and requiring the crew to sail with the ship, placing them in the zone of danger for contracting said disease by making them to work in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

b. His objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-19 aboard the vessel; and/or

c. His objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by COVID-19, while on the vessel after the Defendant informed the crew that they would not be disembarked in Uruguay and repatriated by being flown home and instead would be required to sail with the vessel from Uruguay to the Canary Islands in crowded conditions with other crew members who had or may have had COVID-19 in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

d. His objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-19 aboard the vessel, following his disembarkation in Uruguay, while he was forced to remain in quarantine before being repatriated to his home country.

54.     In addition, the Plaintiff Zuterek, who was in the zone of danger of contacting COVID-19, suffered severe emotional distress as a legal result of the Defendant's above described

negligence and continues to suffer from the effects of post-traumatic stress disorder due to:

a. His objective, genuine and serious fear of contracting COVID-19 and suffering from the severe consequences, including death and serious injury and disability, caused by said disease, as a result of the Defendant's refusal to cancel the voyage of March 15, 2020 and requiring the crew to sail with the ship, placing them in the zone of danger for contracting said disease by making them to work in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

b. His objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by COVID-19, while on the vessel after the Defendant informed the crew that they would not be disembarked in Uruguay and repatriated by being flown home and instead would be required to sail with the vessel from Uruguay to the Canary Islands in crowded conditions with other crew members who had or may have had COVID-19 in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

c. His objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease following his disembarkation in Uruguay, while he was forced to remain in quarantine before being repatriated to his home country.

WHEREFORE, the Plaintiffs Usme and Zuterek each demand judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs and demand trial by jury of all issues triable of right by jury.

## COUNT II

### JONES ACT CLAIM AGAINST CMI-L BY PLAINTIFFS GAVILAN, PAZ,

## **VASQUEZ, PEREZ AND ORTIZ**

55.     The Plaintiffs repeat and adopt paragraphs one (1) through nine (9), twelve (12)

through sixteen (16) and eighteen (18) through thirty-nine (39) above and further aver.

56**.**     The Jones Act, 46 U.S.C. §30104 f/k/a 46 App. U.S.C.A. §688 provides:

> A seaman injured in the course of employment or, if the seaman dies from the
> injury, the personal representative of the seaman may elect to bring <u>a civil action at
> law, with the right of trial by jury</u>, against the employer. <u>Laws of the United States
> regulating</u> recovery for personal injury to, or death of, <u>a railway employee apply to
> an action</u> <u>under this section.</u> (emphasis added)

57.     The Federal Employers Liability Act, 45 U.S.C. §51, which is incorporated by

reference into the Jones Act protections provided to seamen, provides in pertinent part:

> Every common carrier by railroad while engaging in commerce . . . shall be liable
> in damages to any person suffering injury while he is employed by such carrier in
> such commerce . . . for such injury or death resulting in whole or in part from the
> negligence of any of the officers, agents, or employees of such carrier, or by reason
> of any defect or insufficiency, due to its negligence, in its cars, engines, appliances,
> machinery, track, roadbed, works, boats, wharves, or other equipment.

58.     The Federal Employers Liability Act, 45 U.S.C. §55, which is incorporated by

reference into the Jones Act protections provided to seamen, provides in pertinent part:

> <u>Any contract, rule, regulation, or device whatsoever, the purpose or intent of which
> shall be to enable any common carrier to exempt itself from any liability created by
> this chapter, shall to that extent be void</u>: *Provided,* That in any action brought
> against any such common carrier under or by virtue of any of the provisions of this
> chapter, such common carrier may set off therein any sum it has contributed or paid
> to any insurance, relief benefit, or indemnity that may have been paid to the injured
> employee or the person entitled thereto on account of the injury or death for which
> said action was brought. (emphasis added)

59.     At all times material hereto, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz

were employed by the Defendant CMI-L, while serving aboard the *Greg Mortimer* as seamen

under the Jones Act and U.S. general maritime law and accordingly, the Defendant CMI-L was

their Jones Act employer.

60.     In the alternative, as set forth in detail in paragraph seventeen (17) above, the

Defendant CMI, Inc. was the Jones Act employer of the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz by virtue of their status as borrowed servants in that said Defendant controlled all aspects of their work.

61.     As a result of the Plaintiffs' status as seamen and the Defendant's relationship as their employer, the Defendant CMI-L owed each of the Plaintiffs the legal duty to use reasonable care to provide them with a safe place to work as well as the legal duty to provide them with prompt, adequate and proper cure for any illness, sickness, disease, condition and/or injury which was contracted, aggravated and or manifested itself while they were in the service to their vessel.

62.     The Defendant CMI-L negligently complied with its legal duties under the Jones Act to each of the Plaintiffs, including but not limited to in the following manners:

a.  By failing to provide the Plaintiffs with a safe place to work and instead exposing them to COVID-19, which each of the Plaintiffs contracted as a result of their employment with the Defendant, and/or

b.  By refusing to cancel the March 15, 2020 voyage and instead proceeding forward with it, thereby exposing each of the Plaintiffs to an unreasonable risk of contracting COVID-19, which they in fact did, and/or

c.  By performing inadequate, incomplete, careless or insufficient medical evaluations of the passengers and crew aboard the *Greg Mortimer* to identify anyone carrying the disease prior to the commencement of the March 15, 2020 voyage, and/or

d.  By failing to timely enact and/or properly implement appropriate, sufficient and adequate procedures to safeguard the passengers and crew from contracting and/or spreading COVID-19, including but not limited to those recommended by the CDC and other governmental health authorities, and/or

e.  By failing to provide the crew with proper, sufficient and adequate personal protection equipment, including but not limited to appropriate and sufficient masks, gloves, coveralls, safety glasses, face masks and protective clothing, and/or

f.  By failing to provide proper, sufficient and adequate medical testing equipment to perform proper and timely testing on passengers and crew to determine if they had contracted COVID-19, and/or

g.  By failing to properly, sufficiently and adequately sanitize and/or disinfect the vessel's

common areas, passenger cabins and/or crewmembers' cabins aboard the vessel to prevent the spread of COVID-19, and/or

h. By failing to adopt and/or implement safe and sanitary food practices aboard the vessel designed to prevent the spread of COVID-19, and/or

i. By failing to adopt and/or implement proper, adequate and appropriate policies in place to manage and/or contain the outbreak and spread of COVID-19, and/or

j. By failing to provide sanitary vessels upon which the Plaintiffs were assigned to work so as to prevent outbreaks of COVID-19, as a result of inadequate and/or ineffective cleaning and sanitary procedures and/or a lack of equipment and supplies, and/or

k. By failing to equip the vessel and/or to provide crewmembers with a sufficient amount of cleaning and/or disinfectant equipment and/or personal protective equipment, and/or

l. By failing to consult with the appropriate shoreside medical specialists once the Captain first became aware that one of the passengers had the signs and symptoms of COVID-19 and/or by refusing or failing to follow the recommendations of shoreside medical specialists regarding the proper response thereto and/or

m. In other manners expected to be revealed in discovery.

63.     That at all times material, the Defendant CMI-L knew or should have known of the above described negligent acts or omissions and was on notice of the hazards that they created for its crewmembers to contract COVID-19 and did not correct or remedy them and as a legal result thereof each of the Plaintiffs contracted or were in the zone of danger for contracting COVID-19 while in the course of their employment with the Defendant.

64.     The Defendant is vicariously liable and/or otherwise responsible for the acts and omissions of the crew and officers aboard the vessel and its other employees working aboard the subject vessel and/or on land.

65.     Under the Jones Act, the Defendant is also vicariously liable for the negligence of all of the shoreside doctors, nurses, hospitals and health care providers it selected to treat the Plaintiffs or to provide medical advice regarding such diagnosis and treatment, including but not limited to the Defendant VIKAND.

30

66.     The above described negligent acts and/or omissions caused and/or contributed to the Plaintiffs contracting and/or being placed in the zone of danger for contracting COVID-19 and other resulting medical complications, conditions and personal injuries.

67.     As a legal result thereof, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz each suffered extreme physical pain and suffering, mental anguish, reduced lung function and/or capacity and other physical injuries and suffered a loss of enjoyment of life, physical and/or functional disability, physical and/or functional impairment, aggravations of previously existing conditions, medical expenses, lost wages and impairment of their working capacity. Said injuries are permanent in nature and accordingly, the Plaintiffs' losses and damages are continuing in nature.

68.     In addition, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz all manifested the symptoms of COVID-19 after coming into physical contact with and sustaining a physical impact from the virus while on board the subject vessel or alternatively were in the zone of danger of contacting COVID-19 and suffered severe emotional distress as a legal result of the Defendant's above described negligence and continues to suffer from the effects of post- traumatic stress disorder due to:

a. Their objective, genuine and serious fear of contracting COVID-19 and suffering from the severe consequences, including death and serious injury and disability, caused by said disease, as a result of the Defendant's refusal to cancel the voyage of March 15, 2020 and requiring the crew to sail with the ship, placing them in the zone of danger for contracting said disease by making them to work in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

b. Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-

31

19 aboard the vessel; and/or

c.  Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by COVID-19, while on the vessel after the Defendant informed the crew that they would not be disembarked in Uruguay and repatriated by being flown home and instead would be required to sail with the vessel from Uruguay to the Canary Islands in crowded conditions with other crew members who had or may have had COVID-19 in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

d.  Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-19 aboard the vessel, following his disembarkation in Uruguay, while he was forced to remain in quarantine before being repatriated to his home country.

WHEREFORE, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz each demand judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs and demand trial by jury of all issues triable of right by jury.

## COUNT III

## NEGLIGENCE CLAIM AGAINST CMI, INC. BY PLAINTIFFS GAVILAN, PAZ, VASQUEZ, PEREZ AND ORTIZ

69.     The Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz repeat and adopt paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15), seventeen (17 through thirty-nine (39) above and further aver.

70.     At all times material hereto, the Defendant CMI, Inc. was the manager of the *Greg Mortimer,* in which capacity it exercised total management and control of the vessel's operational,

32

maintenance, technical and financial services, including but not limited to providing all technical and support services necessary to maintain the safe and reliable operation of the vessel; all medical services for the crew; the employment of medical and other consultants necessary for the safe operation of the vessel and the safety and welfare of the crew; the purchase and supply of cleaning products, disinfecting supplies and personal protection equipment necessary for the use and safety of the crew; monitoring and supervising the technical aspects of health and hygiene aboard the vessel; advising the owners and/or charterers of the vessel regarding the safety of operating the vessel in response to potential hazards and determining when and where the vessel can be safely operated for the safety and welfare of the crew and passengers.

71.  At all times material, the Defendant CMI, Inc. owed all passengers and crew aboard the *Greg Mortimer* the legal duty to exercise reasonable care in the performance of the above described operational, maintenance, technical and financial services, so as to avoid exposing them to foreseeable hazards and risks of injury, including through the exposure to highly contagious diseases and illnesses, such as COVID-19.

72.  The Defendant CMI, Inc. negligently breached its legal duty to exercise reasonable care in the performance of the above described operational, maintenance, technical and financial services to each of the Plaintiffs, including but not limited to in the following manners:

    a.  By failing to provide the Plaintiffs with a safe place to work and instead exposing them to COVID-19 and the injuries described above; and/or

    b.  By refusing to cancel the March 15, 2020 voyage and instead proceeding forward with it, thereby exposing each of the Plaintiffs to an unreasonable risk of contracting COVID-19; and/or

    c.  By performing inadequate, incomplete, careless or insufficient medical evaluations of the passengers and crew aboard the *Greg Mortimer* to identify anyone carrying the disease prior to the commencement of the March 15, 2020 voyage, and/or

    d.  By failing to timely enact and/or properly implement appropriate, sufficient and adequate procedures to safeguard the passengers and crew from contracting and/or

spreading COVID-19, including but not limited to those recommended by the CDC and other governmental health authorities, and/or

e.   By failing to provide the crew with proper, sufficient and adequate personal protection equipment, including but not limited to appropriate and sufficient masks, gloves, coveralls, safety glasses, face masks and protective clothing, and/or

f.   By failing to provide proper, sufficient and adequate medical testing equipment to perform proper and timely testing on passengers and crew to determine if they had contracted COVID-19, and/or

g.   By failing to properly, sufficiently and adequately sanitize and/or disinfect the vessel's common areas, passenger cabins and/or crewmembers' cabins aboard the vessel to prevent the spread of COVID-19, and/or

h.   By failing to adopt and/or implement safe and sanitary food practices aboard the vessel designed to prevent the spread of COVID-19, and/or

i.   By failing to adopt and/or implement proper, adequate and appropriate policies in place to manage and/or contain the outbreak and spread of COVID-19, and/or

j.   By failing to provide a sanitary vessel upon which the Plaintiffs were assigned to work so as to prevent outbreaks of COVID-19, as a result of inadequate and/or ineffective cleaning and sanitary procedures and/or a lack of equipment and supplies, and/or

k.   By failing to equip the vessel and/or to provide crewmembers with a sufficient amount of cleaning and/or disinfectant equipment and/or personal protective equipment, and/or

l.   By failing to consult with the appropriate shoreside medical specialists once the Captain first became aware that one of the passengers had the signs and symptoms of COVID-19 and/or by refusing or failing to follow the recommendations of shoreside medical specialists regarding the proper response thereto and/or

m.   In other manners expected to be revealed in discovery.

73.   That at all times material, the Defendant CMI, Inc. knew or should have known of the above described negligent acts or omissions and was on notice of the hazards that it created for the crewmembers of the *Greg Mortimer* to contract COVID-19 and did not correct or remedy them and as a legal result thereof each of the Plaintiffs contracted or were in the zone of danger for contracting COVID-19 while in the course of their work aboard the *Greg Mortimer*.

74.   The Defendant CMI, Inc. is vicariously liable and/or otherwise responsible for the

34

acts and omissions of the crew and officers aboard the vessel which it employed and its other employees working on land.

75.     The Defendant is also vicariously liable for the negligence of all of the shoreside consultants which it hired to provide medical advice in carrying out its operational, maintenance, technical and financial services for the safety and welfare of the passengers and crew aboard the Greg Mortimer, including but not limited to the Defendant VIKAND.

76.     The above described negligent acts and/or omissions caused and/or contributed to the Plaintiffs contracting and/or being placed in the zone of danger for contracting COVID-19 and other resulting medical complications, conditions and personal injuries.

77.     As a legal result thereof, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz each suffered extreme physical pain and suffering, mental anguish, reduced lung function and/or capacity and other physical injuries and suffered a loss of enjoyment of life, physical and/or functional disability, physical and/or functional impairment, aggravations of previously existing conditions, medical expenses, lost wages and impairment of their working capacity. Said injuries are permanent in nature and accordingly, the Plaintiffs' losses and damages are continuing in nature.

78.     In addition, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz all manifested the symptoms of COVID-19 after coming into physical contact with and sustaining a physical impact from the virus while on board the subject vessel or alternatively were in the zone of danger for contacting COVID-19 and suffered severe emotional distress as a legal result of the Defendant's above described negligence and continue to suffer from the effects of post-traumatic stress disorder due to:

a. Their objective, genuine and serious fear of contracting COVID-19 and suffering from the severe consequences, including death and serious injury and disability, caused by said disease,

as a result of the Defendant's refusal to cancel the voyage of March 15, 2020 and requiring the crew to sail with the ship, placing them in the zone of danger for contracting said disease by making them to work in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

b.  Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-19 aboard the vessel; and/or

c.  Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by COVID-19, while on the vessel after the Defendant informed the crew that they would not be disembarked in Uruguay and repatriated by being flown home and instead would be required to sail with the vessel from Uruguay to the Canary Islands in crowded conditions with other crew members who had or may have had COVID-19 in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

d.  Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting COVID-19 aboard the vessel, following his disembarkation in Uruguay, while he was forced to remain in quarantine before being repatriated to his home country.

WHEREFORE, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz each demand judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs and demand trial by jury of all issues triable of right by jury.

## COUNT IV

## <u>NEGLIGENCE OF THE DEFENDANT VIKAND</u>

79.     The Plaintiffs repeat and adopt paragraphs one (1) through eight (8), eleven (11) through fifteen (15) and nineteen (19) through thirty-nine (39) above and further aver:

80.     The Defendant VIKAND owed each of the Plaintiffs the legal duty to exercise reasonable care in providing medical advice, consultation and assistance to the Defendants CMI Inc., CMI-L for the purposes of determining whether to undertake the March 15, 2020 voyage, assisting the other Defendants in providing a safe place to work aboard the vessel for the benefit of the Plaintiffs during the COVID-19 pandemic, in preventing an outbreak of COVID-19 aboard the vessel, in responding to the COVID-19 passenger and crew cases aboard the vessel and in assisting and/or participating in the medical diagnosis, care and treatment of the Plaintiffs aboard the vessel and thereafter prior to their repatriation: (a) by virtue of its agreement to provide medical management and consulting services to the Defendants CMI Inc. and/or CMI-L in connection with all medical issues for the safety, welfare and medical care to be rendered to crew members, since it knew or should have known that the Defendants CMI, Inc. and/or CMI-L and their employees and crew would rely upon said medical advice and consultation, and/or (b) by virtue of undertaking to provide medical advice and consultation to the Defendants CMI, Inc., and/or CMI-L regarding the above described issues, since it knew or should have known that the Defendants CMI, Inc. and/or CMI-L and their employees and crew would rely upon said medical advice and assistance; and/or; and/or (c) by virtue of the creation of a doctor-patient relationship as a result of its provision of medical advice and assistance to the shipboard medical staff in rendering prophylactic advice or medical treatment to the Plaintiffs so as to influence and affect the diagnosis and treatment provided.

81.     The Defendant VIKLAND was negligent in performing said medical management and consulting services and in rendering said medical consultation, advice, care and treatment by:

a.  By not advising or recommending that the Defendants and the charterer to cancel the March 15, 2020 voyage; and/or

b.  By failing to give the Defendants the proper medical advice to assist them in providing the Plaintiffs with a safe place to work; and/or

c.  By performing or assisting in the performance of inadequate, incomplete, careless or insufficient medical evaluations of the passengers and crew aboard the *Greg Mortimer* to identify anyone carrying the disease prior to the commencement of the March 15, 2020 voyage; and/or

d.  By failing to give the Defendants the proper advice for making the vessel a safe place to work for the crew, including the Plaintiffs, to protect them from the risks and hazardous of contracting COVID-19; and/or

e.  By failing to advise the Defendants as to the proper, sufficient and adequate personal protection equipment, including but not limited to appropriate and sufficient masks, gloves, coveralls, safety glasses, face masks and protective clothing necessary for the safety of their crew, including the Plaintiffs; and/or

f.  By failing to assist the Defendants in obtaining the proper, sufficient and adequate personal protection equipment, including but not limited to appropriate and sufficient masks, gloves, coveralls, safety glasses, face masks and protective clothing necessary for the safety of their crew, including the Plaintiffs; and/or

g.  By failing to advise the Defendants of the proper, sufficient and adequate medical testing equipment necessary to perform proper and timely testing on passengers and crew to determine whether they had contracted COVID-19; and/or

h.  By failing to assist the Defendants in obtaining the proper, sufficient and adequate medical testing equipment necessary to perform proper and timely testing on passengers and crew to determine whether they had contracted COVID-19; and/or

i.  By failing to properly advise the Defendants in the adoption and/or implementation of proper, sufficient and adequate health and sanitary procedures to prevent the spread of COVID-19 aboard the subject vessel; and/or

j.  By failing to properly advise the Defendants of the necessary and effective cleaning and/or disinfectant equipment required to prevent the spread of COVID-19 aboard the subject vessel; and/or

k.  By failing to properly assist the Defendants in obtaining the necessary and effective cleaning and/or disinfectant equipment required to prevent the spread of COVID-19 aboard the subject vessel; and/or

l.  By failing to provide the shipboard medical staff with the proper advice and

38

recommendations regarding the proper diagnosis and treatment of passengers and crew suffering from COVID-19, resulting in an outbreak of coronavirus aboard the vessel; and/or

m. In other manners expected to be revealed in discovery.

82.     The Defendant VIKAND is vicariously liable and/or otherwise responsible for the acts and omissions of its employees, both shoreside and on aboard the subject vessel that were involved in any of the above described activities.

83.     That at all times material, the Defendant VIKAND knew or should have known of the above described negligent acts or omissions and was on notice of the hazards that they created for the crewmembers aboard the *Greg Mortimer* to contract COVID-19 and did not correct or remedy them and as a legal result thereof each of the Plaintiffs contracted and/or was placed in the zone of danger for contracting COVID-19 while in the course of their employment.

84.     The above described in negligent acts and/or omissions caused and/or contributed to the Plaintiffs contracting and/or being placed in the zone of danger for contracting COVID-19 and other resulting medical complications, conditions and personal injuries.

85.     As a legal result thereof, the Plaintiffs Usme, Gavilan, Paz, Vasquez, Perez and Ortiz each suffered extreme physical pain and suffering, mental anguish, reduced lung function and/or capacity and other physical injuries and suffered a loss of enjoyment of life, physical and/or functional disability, physical and/or functional impairment, aggravations of previously existing conditions, medical expenses, lost wages and impairment of their working capacity. Said injuries are permanent in nature and accordingly, the Plaintiffs' losses and damages are continuing in nature.

86.     In addition, the Plaintiffs Usme, Zuterek, Gavilan, Paz, Vasquez, Perez and Ortiz, who each manifested the symptoms of COVID-19 after coming into physical contact with and sustaining a physical impact from the virus while on board the subject vessel or alternatively were

39

in the zone of danger for such contact, suffered severe emotional distress as a legal result of the Defendant's above described negligence and continue to suffer from the effects of post-traumatic stress disorder due to:

a. Their objective, genuine and serious fear of contracting COVID-19 and suffering from the severe consequences, including death and serious injury and disability, caused by said disease, as a result of the Defendant's refusal to recommend the cancellation of the voyage of March 15, 2020 resulted in being required to sail with the ship, placing them in the zone of danger for contracting said disease by making them to work in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

b. Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability caused by said disease; and/or

c. Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by COVID-19, while on the vessel after their employer, relying upon the advice of the Defendant Vikand, informed them that they would not be disembarked in Uruguay and repatriated by being flown home and instead would be required to sail with the vessel from Uruguay to the Canary Islands in crowded conditions with other crew members who had or may have had COVID-19 in conditions that have been described by government health agencies as particularly conducive to outbreaks of COVID-19 because of the nature and function of cruise ships; and/or

d. Their objective, genuine and serious fear of suffering from the severe consequences, including death and serious injury and disability, caused by said disease after contracting or being placed in the zone of danger for contracting COVID-19, following their disembarkation in Uruguay, while they were forced to remain in quarantine before being repatriated to their home

40

countries.

WHEREFORE, each of the Plaintiffs demand judgment against the Defendant VIKLAND for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs and demand trial by jury of all issues triable of right by jury.

**COUNT V**

**RETALITORY DISCHARGE AGAINST CMI INC FOR TERMINATION OF
SAFETY OFFICER ZUTEREK**

87.     The Plaintiff Safety Officer Zuterek repeats and adopts paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15) and seventeen (17) through thirty-nine (39) above and further avers:

88.     The Defendant CMI, Inc. originally entered into a four-month contract with the Plaintiff to serve aboard the *Greg Mortimer* as Safety Officer from November 11, 2019 through and including the end of the voyage concluding on March 15, 2020 in Ushuaia, Argentina, where he would be replaced by a new Safety Officer.  At the time of his anticipated discharge from the vessel and repatriation home, Safety Officer Zuterek had received an exemplary written evaluation from the First Officer containing all "excellents," "very goods" and "goods," recommending him for continued employment without qualification and concluding "He is very welcome back to the Greg Mortimer team."

89.     The replacement Safety Officer, however, was not able to fly to Ushuaia for the departure of the *Greg Mortimer* and as a result the Defendant verbally requested that Safety Officer Zuterek continue to serve as Safety Officer, since the vessel was not permitted to sail without a safety officer, until he was replaced by another safety officer and repatriated home.

90.     On or about April 25, 2020, Safety Officer Zuterek, who was the third ranking officer on the ship, met with the two officers ranked in the chain of command above him—the

41

ship's master, Captain Joachim Saterskog, who was the Defendant's highest ranking agent and representative on board and First Officer Arsen Proston.

91.     In this meeting, Safety Officer Zuterek, whose duties included the safety of the crew, explained to the Captain and First Officer that he was extremely concerned that the Defendant's repatriation plan to sail the crew from Uruguay to the Canary Islands, only to then transport them back to Latin and South America, posed a serious risk of injury and harm to the crew.  He further explained that this concern for the safety of the crew under this plan was due to the highly contagious nature of COVID-19 and its severe medical consequences, which included the potential death of those contracting it; the length of the journey; the close quarters in which the crew would be required to work and live over the weeks it would last; the crew's existing state of high apprehension, fear and anxiety over the hazards of the trip and the lack of available medical facilities while sailing across the Atlantic Ocean.

92.     As a result of these concerns, Safety Officer Zuterek, whose responsibilities included the safety of the crew, strongly recommended that the proposed repatriation plan be abandoned in favor of a safe method of repatriation and thereafter protested the Defendant's refusal to deviate from the proposed plan.

93.     When the Defendant continued to refuse to address Safety Officer Zuterek's concerns for the safety of the crew, Safety Officer Zuterek indicated that he would report the Defendant's hazardous plan to the local law enforcement authorities if necessary in order to protect the safety and lives of the crew.

94.     As a result of his refusal to jeopardize the safety of the crew by going along with the Defendant's highly dangerous repatriation plan and instead indicating that he would go to the local authorities if necessary to protect the safety of the crew, the Defendant, through its agent, employee and representative Captain Saterskog, terminated the Plaintiff claiming that he was

42

guilty of insubordination for refusing to "support him as a team member," "not want[ing] to be part of the bridge team," and "disrespectful behavior," further ordering that he be kept confined to his cabin.

95.     The Defendant's actions were merely a pretext to punish the Plaintiff for refusing to go along with it highly dangerous repatriation plan and instead trying to protect the health and safety of the crew, to keep him on board so that the ship would have a safety officer and could sail and to prevent him from reporting the Defendant's ill-conceived and hazardous plan to the local authorities.

96.     These actions were part of a pattern of conduct by the Defendant, which exposed its crew to serious injury by first concealing the risk of contracting COVID-19 to the crew in undertaking the voyage on March 15, 2020 over the objections of the ship's doctor, then subsequently attempting to hide the true nature of the outbreak of the highly contagious COVID-19 aboard the vessel by improperly pressuring the ship's doctor to lie on the Declaration of Health form required by the Uruguay health authorities as described above and then risking its crew member's safety and health by concealing the nature and hazards of its repatriation plan to the crew in order to save money repatriating them, which plan was eventually aborted only after intervention by the government of Honduras.

97.     As a result of its above described actions, the Defendant is guilty of retaliatory discharge of Safety Officer Zuterek by virtue of either or both:

a.     46 U.S.C. §2144, which provides:

(a)(1) A person may not discharge or in any manner discriminate against a seaman because--

(A) the seaman in good faith has reported or is about to report to the Coast Guard or other appropriate Federal agency or department that the seaman believes that a violation of a maritime safety law or regulation prescribed

43

under that law or regulation has occurred; [and/or]

(B) the seaman has refused to perform duties ordered by the seaman's employer because the seaman has a reasonable apprehension or expectation that performing such duties would result in serious injury to the seaman, other seamen, or the public.

and/or

b.      The general maritime law which recognizes a cause of action for retaliatory discharge where the employer abuses it right to terminate the employment relationship to contravene an established public policy, in this case the health, welfare and safety of the vessel's crew.

98.    As a legal result of the Defendant's unlawful retaliatory discharge of the Plaintiff, Safety Officer Zuterek has suffered compensatory damages, including lost earnings, lost future earnings, impairment of his earning capacity as a result of the damage to his professional reputation by virtue of the false accusations upon which the termination was based and the resulting mental anguish suffered as a result of his wrongful discharge and the damage it has caused to his career and his ability to support his family.

99.   The Defendant is vicariously liable and/or otherwise responsible for the acts and omissions of the crew and officers aboard the vessel, including but not limited to the Captain and First Officer and its other employees working aboard the subject vessel and/or on land.

WHEREFORE, the Plaintiff Safety Officer Zuterek demands judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs and demands trial by jury of all issues triable of right by jury.

## COUNT VI

### FALSE IMPRIONMENT OF SAFETY OFFICER ZUTEREK BY CMI INC

44

100.     The Plaintiff Safety Officer Zuterek repeats and adopts paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15), seventeen (17) through thirty-nine (39), eighty-eight (88) through ninety-six (96) and ninety-nine (99) above and further avers:

101.     The act of the Captain in confining the Plaintiff to his cabin for eight (8) days without legal justification or cause constitutes false imprisonment.

102.     As a legal result of the Defendant's false imprisonment of the Plaintiff, Safety Officer Zuterek has suffered compensatory damages, including lost earnings, lost future earnings, impairment of his earning capacity as a result of the damage to his professional reputation by virtue of the false accusations upon which said confinement was based and the resulting mental anguish suffered as a result of his false imprisonment and the damage it has caused to his career and his ability to support his family.

103.     The Plaintiff, Safety Officer Zuterek, is further entitled to the recovery of punitive damages in that the actions of the Defendant CMI, Inc. and its agents and employees performed on its behalf constituted intentional wrongdoing and/or reckless and willful misconduct because,

    a. It was intended to prevent the Plaintiff from reporting the Defendant's unsafe and reckless repatriation plan to the appropriate authorities; and/or

    b. It was intended to promote the Defendant's unsafe and reckless repatriation plan to require the crew to sail aboard the *Greg Mortimer* to Africa, by silencing the Plaintiff's protestations regarding the unsafe and reckless nature of the proposed plan; and/or

    c. It was intended to promote the Defendant's unsafe and reckless plan to require the crew to sail aboard the *Greg Mortimer* to Africa, by keeping the Plaintiff onboard, in order to satisfy the requirement that the ship have a safety officer in order to be able to sail; and/or

    d. It was intended to punish the Plaintiff for attempting to perform his duties to act in the best interests of the welfare and safety of the crew by objecting to the unsafe and reckless nature of the proposed repatriation plan, rather than in accordance with the Defendant's financial interests in trying to find the cheapest method of repatriating the crew without regard to its safety; and/or

e.   in other manners expected to be shown in discovery.

WHEREFORE, the Plaintiff Safety Officer Zuterek demands judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs as well as punitive damages and demands trial by jury of all issues triable of right by jury.

## COUNT VII

### CMI, INC.'S DEFAMATION OF SAFETY OFFICER ZUTEREK

104.   The Plaintiff Safety Officer Zuterek repeats and adopts paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15), seventeen (17) through thirty-nine (39), eighty-eight (88) through ninety-six (96) and ninety-nine (99) above and further avers:

105.   The act of the Captain in falsely accusing the Plaintiff of being guilty of insubordination for refusing to "support him as a team member," "not want[ing] to be part of the bridge team," and "disrespectful behavior," followed by conducting a captain's court and termination of employment based upon said false accusations, which were then published into his employment records constitutes defamation.

106.   As a legal result of the Defendant's defamation of the Plaintiff, Safety Officer Zuterek has suffered injuries and compensatory damages, including lost earnings, lost future earnings, impairment of his earning capacity as a result of the damage to his professional reputation by virtue of the false accusations upon which said captain's court and termination were based and published into his employment record and the resulting mental anguish suffered as a result of these false accusations and the damage they have caused and will continue to cause to his career and his ability to support his family.

107.   The Plaintiff, Safety Officer Zuterek, is further entitled to the recovery of punitive

46

damages in that the actions of the Defendant CMI, Inc. and its agents and employees performed on its behalf constituted intentional wrongdoing and/or reckless and willful misconduct because,

    a. They were intended to prevent the Plaintiff from reporting the Defendant's unsafe and reckless repatriation plan to the appropriate authorities; and/or

    b. They were intended to promote the Defendant's unsafe and reckless repatriation plan to require the crew to sail aboard the *Greg Mortimer* to Africa, by silencing the Plaintiff's protestations regarding the unsafe and reckless nature of the proposed plan; and/or

    c. They were intended to cover up or justify to the public the Defendant's unsafe and reckless repatriation plan to require the crew to sail aboard the *Greg Mortimer* to Africa, by falsely impugning the Plaintiff's credibility; and/or

    d. They were intended to punish the Plaintiff for attempting to perform his duties to act in the best interests of the welfare and safety of the crew by objecting to the unsafe and reckless nature of the proposed repatriation plan, rather than in accordance with the Defendant's financial interests in trying to find the cheapest method of repatriating the crew without regard to its safety; and/or

    e. in other manners expected to be shown in discovery.

WHEREFORE, the Plaintiff Safety Officer Zuterek demands judgment against the Defendant CMI, Inc. for compensatory damages in excess of Seventy-five Thousand Dollars ($75,000), exclusive of interest and costs as well as punitive damages and demands trial by jury of all issues triable of right by jury.

## COUNT VIII

### USME CLAIM FOR MAINTENANCE, CURE & WAGES AGAINST CMI, INC.

108.    The Plaintiff Usme repeats and adopts paragraphs one (1) through eight (8), ten (10), twelve (12) through fifteen (15) and seventeen (17) through thirty-nine (39) above and further avers:

109.    By virtue of his status as a seaman, the Plaintiff Usme was entitled to the receipt of maintenance, cure and unearned wages for illnesses and injuries incurred during his service to the

47

vessel *Greg Mortimer* from his employer.

110.   At all times material the Defendant CMI, Inc. employed the Plaintiff Usme either directly or as a borrowed servant to work aboard the *Greg Mortimer*.

111.   That as a consequence of contracting COVID-19 and the resulting medical symptoms, problems and complications described above, the Plaintiff Usme was required to obtain necessary shoreside medical and hospital care to treat said conditions.  Although the Defendant is responsible to pay for said medical and hospital care under the doctrine of cure, it has refused to fully reimburse the Plaintiff for the charges he has incurred in obtaining such reasonable and necessary medical care, despite demands for such reimbursement and as a result the Defendant has breached its legal obligation to provide the Plaintiff with the full and complete cure to which he is entitled.

112.   That as a further consequence of contracting COVID-19 and the resulting medical symptoms, problems and complications described above, the Plaintiff Usme was further entitled to the receipt of maintenance from the Defendant CMI, Inc. until he reached maximum medical cure, however, the Defendant breached its legal obligation to provide the Plaintiff with the full and complete maintenance to which he is entitled by failing and/or refusing to pay the Plaintiff maintenance and cure until he reached the point of maximum medical cure.

113.   That as a seaman aboard the Greg Mortimer, the Plaintiff Usme was also entitled to the receipt of wages until he signed off of the vessel <u>and</u> was repatriated home, however, the Defendant breached its legal obligation to provide the Plaintiff with the full and complete wages to which he is entitled.

Wherefore, the Plaintiff Usme sues the Defendant CMI, Inc. for compensatory damages for unpaid maintenance, cure and wages and demands trial by jury of all issues triable of right by a jury.

## COUNT IX

### PLAINTIFFS GAVILAN, PAZ, VASQUEZ, PEREZ AND ORTIZ MAINTENANCE, CURE AND WAGE CLAIMS AGAINST CMI-L

114.     The Plaintiffs repeat and adopt paragraphs one (1) through nine (9), twelve (12) through sixteen (16) and eighteen (18) through thirty-nine (39) above and further aver.

115.     By virtue of their status as seaman, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz were entitled to the receipt of maintenance, cure and unearned wages for illnesses and injuries incurred during their service to the vessel *Greg Mortimer* from their employer.

116.     At all times material the Defendant CMI-L employed the Plaintiffs  Gavilan, Paz, Vasquez, Perez and Ortiz either directly or as borrowed servants to work aboard the *Greg Mortimer*.

117.     That as a consequence of contracting COVID-19 and the resulting medical symptoms, problems and complications described above, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz were required to obtain necessary shoreside medical and hospital care to treat said conditions.  Although the Defendant is responsible to pay for said medical and hospital care under the doctrine of cure, it has refused to fully reimburse the Plaintiffs for the charges they have incurred in obtaining such reasonable and necessary medical care, despite demands for such reimbursement and as a result the Defendant has breached its legal obligation to provide the Plaintiffs with the full and complete cure to which they are entitled.

118.     That as a further consequence of contracting COVID-19 and the resulting medical symptoms, problems and complications described above, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz were further entitled to the receipt of maintenance from the Defendant CMI-L until they each reached maximum medical cure, however, the Defendant breached its legal obligation to provide the Plaintiffs with the full and complete maintenance to which they are

49

entitled by failing and/or refusing to pay the Plaintiffs maintenance and cure until they reached the point of maximum medical cure.

119.    That as seaman aboard the *Greg Mortimer*, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz were also entitled to the receipt of wages until they signed off of the vessel <u>and</u> were repatriated home, however, the Defendant breached its legal obligation to provide the Plaintiffs with the full and complete wages to which they are entitled.

Wherefore, the Plaintiffs Gavilan, Paz, Vasquez, Perez and Ortiz sue the Defendant CMI-L for compensatory damages for unpaid maintenance, cure and wages and demand trial by jury of all issues triable of right by a jury.

Dated this 29th day of March, 2021.

By: /S/ *Robert D. Peltz*
Robert D. Peltz, Esq. (FBN 220418)
The Peltz Law Firm, P.A.
P.O. Box 56-0003
Miami, Fla. 33256
RPeltzLaw@Gmail.com
        and
Louis A. Vucci, Esq.
The Vucci Law Group, P.A.
8101 Biscayne Blvd.,
Suite 311
Miami, Fla. 33138
VucciGroup@gmail.com

50







SECRETARÍA DE RELACIONES
EXTERIORES Y COOPERACIÓN
INTERNACIONAL

GOBIERNO DE LA
REPÚBLICA DE HONDURAS

* * * *

EMBAJADA DE HONDURAS EN
ARGENTINA

**NV.EHA.CMI.056.2020**

Buenos Aires, April 26, 2020

**Anne Tompkins**
**Director of Human Resources**
**Cruise Management International**
**Miami, Florida**

Dear Mrs. Tompkins:

The Embassy of Honduras in Argentina concurrent in the oriental Republic of Uruguay presents its compliments to Mrs. Anne Tompkins, Director of Human Resources of the Cruise Management International and has the honour to inform that we have been inform thru the Uruguayan media and different government channels, that the Cruise Greg Mortimer anchored 20 km off the coast of Uruguay with Bahamas Flag has planned to departed to the Canary Islands, a Spanish archipelago off the coast of northwestern Africa in the following days with thirteen (13) Honduran crew members onboard. As per our conversation and exchange of emails, our Government is very concern that the Honduran crew members will be taken to a twenty-seven (27) days voyage where the COVID-19 is more at risk to be infected and health conditions will not be the most adequate on aboard without taking the consideration travel arrangements are more expensive.

As you may be aware the COVID-19 pandemic is a public health emergency, it is an economic, social and human crisis, is the biggest international crisis in generations. The President of the Government of Honduras H.E. Juan Orlando Hernandez has release a clear message to all our Embassies and Consulates World Wide and is the protection of our connationals.

As transparent and responsive to help our connationals we request Cruise Management International to provide a charter to Honduras as the best possibility for the repatriations of the thirteen Honduran members crew aboard the Cruise Greg Mortimer, and our Government will arrange with the Ministry of the Oriental Republic of Uruguay a safety health passage to protect the public health of the Uruguayans, the humanitarian flight permission to overfly and land in Honduras.

Av. Santa Fé 936 Piso 6° (C1059ABQ) Ciudad Autónoma de Buenos Aires
Tel.: 00-54(11)-5199-7078 - 0054(11)-5199-7079 - 00-54(11)-5199-7080
Email: emb.hondurasar@gmail.com ● www.sre.gob.hn
Buenos Aires, Argentina

E ⋅ 𝒴



★ ★ ★ ★
SECRETARÍA DE RELACIONES
EXTERIORES Y COOPERACIÓN
INTERNACIONAL



GOBIERNO DE LA
REPÚBLICA DE HONDURAS
★ ★ ★ ★ ★



★ ★ ★ ★
EMBAJADA DE HONDURAS EN
ARGENTINA

As you may be aware of the Maritime Labour Convention on 2006 is an International Labour Organization Convention as in article four (4) established the labor conditions of the workers and rights existing in the international maritime labour, as in article twelve (12) the International Convention on Economic, Social and Cultural Rights as multilateral treaty adopted by the United Nations Assembly on 1966, just to mention examples of the Universal Declaration Human Rights whereas recognition of the inherent dignity and of the equal and inalienable rights.

The Embassy of Honduras in Argentina concurrent in the Oriental Republic of Uruguay avails of this opportunity to renew Mrs. Anne Tompkins, Director of Human Resources of the Cruise Management International the assurances of its highest consideration.

Carlos Rojas Santos
Minister
Chargé d'affaires

CC: Sala Situacional de SREC
     Kenia Godoy, Encargada, Sección Consular de la EHA
     Dietmar Wertanzl, CMI
     Tatjana Espinel, CMI
     Tayfun Aybar, CMI
     OHCHR Geneva
     ILO Geneva
     ICRC Geneva
     Cruz Roja Uruguaya